Horst KRAUS, Plaintiff,

v.

VILLAGE OF BARRINGTON HILLS, et al., Defendants.

No. 82 C 3391.

United States District Court, N.D. Illinois, E.D.

Dec. 20, 1982.

---

Adam Bourgeois, Chicago, Ill., for plaintiffs.

Charles Siemon, Wendy Larsen, Gregory L. Dose, Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., Judge, Kurnik & Knight, Ltd., Park Ridge, Ill., John Cadwalader Menk, John Cadwalader Menk & Assoc., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

GRADY, District Judge.

This is an action for an injunction restraining defendants, the Village of Barrington Hills and its officials, from maintaining police surveillance of the plaintiff Horst Kraus and his home and from enforcing the zoning regulations of Barrington Hills. Before the court is defendants' motion to dismiss. We grant the motion in part and deny it in part.

We assume the facts as stated in the complaint. Plaintiff lives with his wife, Gigi, in a home they own in Barrington Hills, Illinois. He and his wife have organized "an association of heterosexual couples, both married and unmarried, who come to-

gether periodically for the purpose of discussion, association, and experimentation relative to sexual mores and activities and who do also engage in sexual activities with each others' partners on a consentual [sic] basis." The organization is called "The Happy Medium Unlimited," and plaintiff refers to its members' practice of exchanging sexual partners as "swinging." Two hundred fifty couples from Illinois, Wisconsin and Indiana participate. They attend meetings at plaintiff's home and each couple is asked to make a donation to help defray the cost of dinner at the meeting.

In November 1981, plaintiff conferred with the Commander of the Cook County Vice Squad and informed him fully of the organization's swinging activities. The Commander decided that swinging was legal so long as it was consensual and private. On November 26, 1981, the Barrington *Courier* published a lengthy expose of The Happy Medium. Two reporters, posing as a potential swinging couple, gained admission to the plaintiff's home during an organizational meeting and published a detailed account of the members' actions. Four days later the Barrington Hills Village Trustees met to consider whether action should be taken against The Happy Medium. A newspaper quoted Trustee Louis Klein as saying, "Let's do everything to get rid of it." Similar comments were made by other defendants.

The Police Chief of Barrington Hills and the County Vice Squad Sargeant reported to the Board that they could do nothing about plaintiff's activities in his home. Nevertheless, the Board at the November 30, 1981, meeting voted to take whatever action was necessary to stop the activities of The Happy Medium.

On December 1, 1981, Mary C. Marre, the Building/Enforcement Officer of Barrington Hills, wrote to plaintiff informing him that operation of a private club in his home was a violation of § 5–5–2(A) of Barrington Hills' zoning ordinance. Section 5–11–12(B) of the ordinance provides that each day a violation continues is a separate offense. Section 1–4–1 provides for a fine of $500.00

for each offense. Plaintiff's residence is zoned R–1 Residential. Plaintiff contends that Barrington Hills allows other persons owning property zoned R–1 Residential to engage in commercial ventures, such as the practice of law, running a printing shop, and breeding and trading horses.

Barrington Hills has also employed its police in an attempt to end the activities at plaintiff's home. Police officers have been instructed to stop and ticket for the most trivial of violations all cars turning into plaintiff's property. Squad cars are stationed near the entrance to plaintiff's property on Saturday nights during meetings of The Happy Medium. Cars entering and leaving the property are surveilled and their license plate numbers recorded.

Plaintiff contends that Barrington Hills is applying its zoning ordinances arbitrarily, capriciously and selectively against him in order to end the activities of The Happy Medium. Barrington Hills' actions have allegedly violated plaintiff's First, Fourth and Fourteenth Amendment rights. Plaintiff asks that the court enjoin Barrington Hills and its agents from continuing their actions against plaintiff, his guests, and The Happy Medium. Plaintiff also asks for $1 million in compensatory and punitive damages.

*First Amendment Claims*

To support a § 1983 claim, plaintiff must allege that a constitutional right has been violated. Plaintiff claims the activities on his premises are protected by the guarantees of freedom of speech, assembly and association, and the right to privacy.

■ Defendants, in their brief, argue that the club is commercial in nature and therefore has no fundamental constitutional privacy or associational rights. They claim that the size of The Happy Medium, its weekly meetings, and the fact that couples come from at least three states rebuts any claim that a purely personal or friendship relationship is involved. In support of their contention, defendants cite *Stratton v. Drumm,* 445 F.Supp. 1305, 1309 (D.Conn.

1978); *Brown v. Haner,* 410 F.Supp. 399, 401 (W.D.Va.1976); *Cornelius v. Benevolent Protective Order of Elks,* 382 F.Supp. 1182 (D.Conn.1974); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). While these cases do indicate that associational activities that are purely commercial do not come within the core protection of the right to associate, they do not support the proposition that a club which accepts a small donation from its members is thereby transformed into a commercial enterprise. Consequently, we reject this argument.

Next, defendants argue that even if The Happy Medium is a noncommercial organization, its activities—consensual exchange of sexual partners—are not protected by the Constitution.

■ The First Amendment contemplates freedom of speech, press, assembly and petition. By implication, it also contemplates freedom of association—a derivative of the specified freedoms. *NAACP v. Alabama, ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).[1] Plaintiff contends that his right to association with others in the way he desires is at stake in this case. In cases involving freedom of speech, the Supreme Court has protected advocacy which was not "directed to inciting or producing imminent lawless action" or "likely to incite or produce such action." *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). We believe this same principle applies to the derivative freedom of association. Absent associational activities which are illegal or would incite illegal actions, the freedom of association is inviolate. Here, the members of The Happy Medium participate in sexual activities—including adultery—which many would consider immoral. The Illinois statutes, however, only prohibit sexual activities that are "open and notorious." Ill.Rev. Stats. ch. 38, §§ 11–7, 11–8.[2] One of the four basic premises underlying the Act was "protection of the public from open and notorious conduct which disturbs the peace, tends to promote breaches of the peace, or openly flouts accepted standards of morality in the community." Ill.Rev.Stats. ch. 38, § 11–1 et seq. (Smith-Hurd Committee Comments— 1961). The Happy Medium conducts its meetings and activities entirely within the residence of plaintiff. We do not believe that sexual activities behind closed doors jeopardize the public peace; nor does it appear at this stage of the proceeding that

1. Freedom of association has been discussed in a number of Supreme Court cases. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Although there is some question as to whether freedom of association is, in itself, a freedom independent of those freedoms specified in the First Amendment, Raggi, *An Independent Right to Freedom of Association,* 12 Harv. Civil Rights—Civil Liberties L.Rev. 1 (1977), we believe the conduct of members of The Happy Medium may be within the speech protection of the First Amendment. Speech related conduct is protected by the First Amendment. *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). For example, the Supreme Court has written several opinions implying that nude or partially nude dancing is conduct protected by the First Amendment. *New York State Liquor Authority v. Bellanca,* 452 U.S. 714, 101 S.Ct. 2599, 69

L.Ed.2d 357 (1981) (Stevens, J., dissenting). *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972).

2. Although a state may make adultery a criminal act without violating the constitutional rights of adulterers, *see Griswold v. Connecticut,* 381 U.S. 479, 499, 85 S.Ct. 1678, 1689, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring), *Poe v. Ullman,* 367 U.S. 497, 553, 81 S.Ct. 1752, 1782, 6 L.Ed.2d 989 (Harlan, dissenting), Illinois has not made adultery a crime when it is not open and notorious. Justice Marshall in dissenting from the denial of certiorari in a civil case, *Hollenbaugh v. Carnegie Free Library,* 439 U.S. 1052, 99 S.Ct. 734, 58 L.Ed.2d 713 (1978), indicated that the petitioners' rights to pursue an open adulterous relationship were related sufficiently to other fundamental privacy interests and to freedom of association that the rights should not be relegated to minimum equal protection scrutiny, but should at least be balanced against a substantial state interest.

the activity is "open" within the meaning of the criminal statutes.[3]

■ The litmus test of constitutionality is not whether conduct is distasteful. Advocating adultery has long been protected under the First Amendment. *Kingsley International Pictures Corp. v. Regents of the University of the State of New York,* 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959). The Supreme Court in *Cantwell v. Connecticut,* 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940), in discussing the First Amendment freedom of religious faith and political belief, stated: "The essential characteristic of these liberties is that under their shield many types of life, character, opinion and belief can develop unmolested and unobstructed." We believe that freedom of association offers a similar shield.

■ Having said all this, it does not avail the plaintiff Kraus that the conduct of the members of The Happy Medium is protected by freedom of association. Kraus has failed to allege sufficient injury to support his claim that his own freedom of association has been infringed. It is well established that:

> The Article III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action . . . ." *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). *See Data Processing Service*

*v. Camp,* 397 U.S. 150, 151–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970).

*Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Plaintiff must allege a distinct and palpable injury to himself.

Here, Kraus' alleged injury is that he is being prosecuted discriminatorily for zoning ordinance violations, police cars are stationed near the entrance to his property, his guests are ticketed for trivial reasons, and his guests' cars are surveilled. Of these alleged injuries, only the prosecution of Kraus for zoning ordinance violations directly injures him. Neither the stationing of the police cars on the public street near the entrance to Kraus' property, nor the harassment or surveillance of the cars entering or leaving the property, appear to affect Kraus' associational rights in a direct way. That police cars surveil the property apparently has not forced a cessation of the meetings of The Happy Medium. Nor have members been deterred from attending because police have stopped them for minor violations. Plaintiff does not allege that his guests were innocent of the violations for which they were stopped. License plate numbers are public information and not protected from the eyes of the police.[4] Plaintiff does not allege that by taking down the numbers the police have successfully dissuaded members of The Happy Medium from attending meetings.

■ This police conduct also does not injure whatever privacy rights plaintiff may have to engage in sexual activities

---

**3.** It might be argued that the activity which occurs at plaintiff's home is "open and notorious" as far as the members of the group are concerned. Undoubtedly, the legislature never contemplated organizations such as "The Happy Medium" when it chose language to define the crimes of fornication and adultery. The requirement that the conduct be "open and notorious" was designed to put "private" conduct beyond the reach of the criminal law. It is not clear from the complaint whether the sexual activities engaged in by members of The Happy Medium are in the open view of other members or not. The complaint is silent on the point. The matter could be a function of how many members attend a meeting, the number

in attendance who engage in sexual activities, and the number of rooms available for the activity. In any event, we are unable to say on the basis of the present record that any of the conduct which occurs at plaintiff's residence violates the criminal law of Illinois.

**4.** License plates are required to be placed on public display, which distinguishes this case from *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), where the Supreme Court held that confidentiality of the NAACP's membership list was protected by the associational rights of NAACP's members.

behind the closed doors of his home.[5] By stopping cars for violating traffic laws, taking down license plate numbers and surveilling those entering plaintiff's property, the police have not halted the activities of The Happy Medium. Here, the facts are quite different from cases involving prosecution of persons for using contraceptives, *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), or for private possession of obscene material, *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), or even for sodomy, *Doe v. Commonwealth's Attorney,* 403 F.Supp. 1199, *aff'd mem.,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976). Plaintiff is not being prosecuted for anything but a zoning ordinance violation. His privacy is unaffected by the acts of the police—he need only close the door and pull the drapes.

*Enforcement of the Zoning Ordinance*

It is clear that plaintiff stands to be injured for his alleged violation of the Barrington Hills' zoning ordinance. The fine is $500.00 per day.

 We believe that the *Pullman*[6] abstention doctrine applies to this aspect of the case. *Pullman*-type abstention is appropriate where an unconstrued state statute is susceptible of a construction by the state court "which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem." *Harrison v. NAACP,* 360 U.S. 167, 177, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959). In applying *Pullman*-type abstention, the inquiry is two pronged: (1) Is the ordinance under scrutiny unclear or uncertain; (2) will state court resolution of the state issue obviate or substantially modify the federal constitutional question. The zoning ordinance here reads:

5–5–2: PERMITTED USES: Permitted uses of land or buildings, as hereinafter

listed, shall be permitted in the districts indicated under the conditions specified. Unless otherwise specifically set forth, wherever a permitted use is named as a major category in this Chapter, it shall be deemed to include all and only those itemized uses listed under the said major category in the R1 through R4 Districts, as set forth in this Section. No building or zoning lot shall be devoted to any use other than a use permitted hereinafter in the zoning district in which such building or zoning lot shall be located, with the exception of the following:

Uses lawfully established on April 1, 1963, and

Special uses allowed in accordance with the provisions of Section 5–5–3 hereof.

Uses lawfully established on April 1, 1963, and rendered nonconforming thereafter, shall be subject to the regulations of Chapter 9 of this Title.

(A) Permitted Uses, R1 District: The following uses are permitted in the R1 District:

1. Single-family detached dwellings.

2. Agriculture.

3. Cemetaries.

4. Educational (nonboarding) and cultural institutions:

 a. Elementary and nursery schools, nonboarding.

 b. High schools, nonboarding

 c. Public libraries and public art galleries.

5. Recreational facilities:

 a. Forest preserves.

 b. Public parks.

6. Religious institutions:

 a. Churches, chapels, temples and synagogues.

 b. Rectories, parsonages and parish houses.

7. Signs, as regulated by Section 5–5–11 hereinafter.

---

5. If adulterous conduct is protected by the freedom of association, we believe it is also protected by the closely analogous right of privacy. *Wilson v. Swing,* 463 F.Supp. 555 (M.D.N.C.1978).

6. *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

8. Accessory uses, incidental to and on the same or an adjacent zoning or lots under one ownership, as the principal use:

 a. Agricultural buildings and structures.

 b. Athletic fields, playgrounds and polo fields, including stadium and grandstands.

 c. Boathouses, private.

 d. Garages and carports.

 e. Greenhouses and conservatories, private.

 f. Guest houses, private.

 g. Home occupations.

 h. Living quarters, detached, for persons employed on the premises if occupied only by such persons and their immediate family.

 i. Mausoleums, crematories and columbariums in cemetaries.

 j. Playhouses and summer houses.

 k. Roadside stands.

 l. Sewage disposal units, individual, as regulated by Section 5–3–8 of this Title.

The zoning ordinance attempts to specify the uses of R1 property and states that only the listed uses are permitted. This language, however, does not answer all questions as to what activities are permissible. Obviously, the category, "Single family detached dwelling," must allow the single family living in the dwelling to engage in a wide variety of activities consistent with single family living. Surely, for example, the family members are allowed to invite guests into their home, even though the ordinance does not specifically list "entertaining guests" as a permitted use. It also seems likely that at least some meetings of private clubs would be a permitted activity incident to the use of a single family dwelling. Whether the meetings of The Happy Medium are a permitted use in this case is a question which will require interpretation of the ordinance. Neither side has cited a zoning case which seems to provide a clear answer.[7] Therefore, the first prong of *Pullman* is satisfied.

The second prong—whether the state court interpretation of the ordinance might obviate or substantially modify the federal constitutional question[8]—is also satisfied. A state court construction of the ordinance will greatly assist us in determining whether defendants have applied it to plaintiff in a discriminatory way, and whether the ordinance is being used to chill his First Amendment rights. Consequently, we abstain from considering plaintiff's claim that Barrington Hills has unconstitutionally applied its zoning ordinance to him. *Lewellyn v. Gerhardt*, 513 F.2d 184 (7th Cir.1975).

*Section 1985 Claim*

Section 1985(3) provides that if two or more persons in any state conspire to injure another person or his property or deprive him of any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for damages against the conspirators. Plaintiff alleges that the defendants acted in concert to violate his First Amendment rights and to subject him to an unconstitutional application of the zoning ordinance. The analysis we have made of the § 1983 claim applies to the § 1985 claim as well. Therefore, we dismiss the First Amendment claims and abstain from deciding the zoning ordinance claims.

*Section 1981 Claims*

In his complaint, plaintiff also cites 42 U.S.C. § 1981 as a jurisdictional basis for this suit. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right to the full and equal benefit of all laws and proceedings for the security of persons as is enjoyed by white citizens . . . ." The pur-

---

**7.** Indeed, only one case is cited in the parties' discussion of the zoning issue. That case, *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886), throws no light on this ordinance.

**8.** *Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). *See* 1A Moore's Federal Practice ¶ 0.203[1].

pose of the Act is to "uproot the institution of slavery and to eradicate its badges and incidents." *Winston v. Lear-Siegler, Inc.,* 558 F.2d 1266 (6th Cir.1977); *see* Cong. Globe, 36th Cong., 1st Sess. 339–517 (1866). There are no allegations indicating that race discrimination is at issue in this case. Therefore, we dismiss plaintiff's § 1981 claim.

*Conclusion*

Plaintiff has failed to allege facts sufficient to support his claims of abridgement of his freedom of speech, assembly and association or his right to privacy. Therefore, we grant Barrington Hills' motion to dismiss those claims. We also grant Barrington Hills' motion to dismiss the § 1981 claim. We stay the proceedings herein regarding the application of the Barrington Hills' zoning ordinance to plaintiff while the parties pursue appropriate state court remedies. *England v. Louisiana School Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).